IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION


Sanford D. Kohorst,    Case No. 3:09CV2031

        Plaintiff

v.    ORDER

Van Wert County Hospital,

        Defendant


This is an employment discrimination case. Plaintiff Sanford Kohorst claims that he lost his job as a radiologic technician at defendant Van Wert County Hospital (the hospital) due to reverse sex discrimination in violation of Title VII of the Civil Rights Act, 42 U.S.C. 2000e-2(a)(1). Kohorst also asserts Ohio state law claims of intentional infliction of emotional distress, wrongful discharge in violation of public policy and negligent supervision. Jurisdiction is proper under 28 U.S.C. § 1331.

Pending is the hospital's motion for summary judgment. [Doc. 23]. For the reasons discussed below, the hospital's motion is granted.

**Background**

**1. Kohorst's Employment with the Hospital**

Kohorst began his employment with the hospital on April 3, 2006, as a Radiology Student. Kohorst completed his associate's degree in medical imaging, passed the national board exam through the American Registry of Radiologic Technicians (ARRT) and obtained his license through

the state of Ohio as a radiologic technologist (RT). The hospital thereafter promoted him to the position of RT on June 14, 2006. As a RT, Kohorst performed x-rays and received training to perform certain CT examinations.

RTs may register through the ARRT to perform CT examinations. This registration requires specific training procedures as well as passage of a formal examination. But Ohio, like most other states, does not require that RTs obtain that registration in order to perform CT examinations. Rather, RTs can become competent to perform CT examinations through on-the-job training, without any testing by an outside agency. It is the hospital's responsibility to designate whether RTs are competent to perform CT examinations without supervision.

The hospital deemed Kohorst competent to perform CTs of the head and abdomen, contrast administration, and the post-processing of those examinations as of early February 2007. As such, he was a limited CT technologist, as opposed to a full CT technologist who is deemed competent to perform all CT examinations.

It is undisputed that Kohorst had a good rapport with patients and generally conducted thorough examinations. It is also undisputed that the hospital had counseled Kohorst regarding failures to multitask and prioritize.

## 2. The January 31, 2008 Incident

On January 31, 2008, a patient came to the emergency room with various complaints including mild abdominal pain, a headache and high blood pressure. Because the family had reported that the patient had a known abdominal aortic aneurysm (AAA), the treating physician ordered an abdominal CT scan with contrast in order to rule out an AAA at risk of rupture. The physician also ordered a CT scan of the head.

Kohorst called the full CT technologist on duty, Lisa Mueller, to ask what the examination to rule out AAA entailed. It was common procedure for RTs to have questions answered by more experienced RTs over the telephone. Mueller explained that the procedure was the same abdominal CT scan Kohorst had performed in the past, and outlined the steps for how to proceed. Kohorst does not dispute that he was qualified to perform head CT scans and abdominal CT scans with contrast. Kohorst asserts that he was uncomfortable performing the abdominal CT scan with contrast in this situation.

After learning that he would need to wait twenty-minutes for the patient's lab results, Kohorst took a lunch break and proceeded to perform other work duties. There is dispute in the record as to whether these other work duties should have been prioritized over the AAA risk patient. The emergency room physician asked Kohorst about the delay in getting the CT scan results.

After more time had elapsed, Kohorst asked the radiology department secretary to call Mueller in to do the test. Mueller had been under the impression that Kohorst had performed the examination. She was surprised that the scans had not been completed.[1]

Mueller arrived at the hospital within fifteen minutes and performed both the abdominal and head CT scans. Nearly three hours had passed since the emergency room physician ordered the exams.

---

[1] Kohorst alleges that he asked Mueller to come in to perform the examination because he did not feel qualified, whereas the hospital asserts that Kohorst did not clearly indicate that he expected Mueller to perform the procedure, citing Kohorst's written explanation of the incident in which he stated, "I regret not being absolutely clear I needed Lisa to come in." [Doc. 26, at 19].
It is undisputed that the fully trained CT technologist must come in to the hospital if the RT informs her he cannot perform the exam. It is also undisputed that "this was to be a mutually agreed upon issue by the limited and the full [CT] tech." [Doc. 39, at 15].

### 3. Resulting Disciplinary Actions

The hospital uses a progressive discipline policy. This policy provides that termination may result where an employee has a second offense within three months of reaching the policy's fourth level. The hospital's handbook specifically states, however, that:

> The hospital may, when it deems necessary, deviate from the process to address what it considers unique characteristics or serious violations. Any misconduct may lead to any disciplinary action at any time up to and including discharge.

[Doc. 40, at 12].

Mueller informed Teresa Bloomfield, the Director of Radiology and Kohorst's supervisor, about the incident the next morning. Because of the unnecessary delay in patient care, Bloomfield issued Kohorst a verbal reminder, which is the first step in the disciplinary system.

Georgiann Nungester, the Vice President of Ancillary Services, reviewed the incident and determined that because an AAA can be fatal if it is not promptly treated, Kohorst had jeopardized patient safety. Nungester directed Bloomfield to elevate the verbal reminder to a written reprimand, which is the second step in the disciplinary system. Nungester met with Kohorst for nearly an hour to discuss the severity of the incident. She reiterated that the needs of the patient always come first.

The hospital's policy requires that an employee's supervisor draft a corrective action plan in the event of a written reminder. Bloomfield drafted a plan for Kohorst addressing patient care as well as his past issues with multitasking and prioritizing.

At some point after the January 31, 2008 incident, a patient complained to management that he had waited over twenty minutes for a chest x-ray despite there being no other patients and despite the presence of Kohorst in the office. When questioned about the incident, Kohorst responded that he was waiting for one of the clerical staff to check the patient in, and that he was taping a ripped

folder. He claimed he did not realized twenty minutes had elapsed. Kohorst was reminded that he could check in patients himself and again verbally counseled that patient care must be his first priority.

### 4. The May 5, 2008 Incident

On May 5, 2008, a patient came to the emergency room complaining of syncope, or fainting spells. The emergency room physician ordered a head CT scan and chest x-ray. Although Kohorst was the RT on duty, he called in another RT from home to perform the test.

Patricia Vennekotter, the Assistant Director of the Department, had instructed Kohorst to supervise a student working in the office. Kohorst interpreted this to mean that he was not to leave the office to perform any examinations. Another RT performed nearly all the examinations that evening.

The next day, the other RTs who worked with Kohorst reported to Vennekotter that Kohorst had refused to perform any examinations the night before. Dr. Eric V. Jelinger, the chief radiologist for medical imaging, complained to Nungester about Kohorst's behavior and expressed concern about the delay in patient care that evening. Nungester directed Bloomfield to investigate the incident.

Bloomfield's investigation revealed that the patient requiring a head CT scan and chest x-ray had waited over an hour for the examinations. Bloomfield concluded that Kohorst's actions again had resulted in a patient having to wait an inordinate amount of time for a diagnostic test, delaying patient care and jeopardizing patient safety.

**5. Termination**

Following the May 5, 2008 incident, Bloomfield, Nungester and Joyce Pothast, the Vice President of Human Resources and Environmental Services, determined that Kohorst had failed to adhere to his corrective action plan and properly perform his duties as an RT. They decided to fire Kohorst effective May 19, 2008, as his repeated delays in patient care had jeopardized patient safety. Kohorst received a hearing on his grievance, and his termination was upheld on peer review.

Kohorst filed suit, alleging reverse sex discrimination, intentional infliction of emotional distress, wrongful discharge in violation of public policy and negligent supervision. The hospital seeks summary judgment in its favor on all claims.

**Standard of Review**

A party is entitled to summary judgment on motion under Federal Rule of Civil Procedure 56 if the nonmoving party fails to show the existence of an essential element for which that party bears the burden of proof. *Celotex Corp. v. Cartrett*, 477 U.S. 317, 322 (1986). The movant initially must show the absence of a genuine issue of material fact. *Id*. at 323.

Once the movant meets the initial burden, the "burden shifts to the nonmoving party [to] set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)). Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and submit admissible evidence supporting its position. *Celotex*, *supra*, 477 U.S. at 324.

In deciding a motion for summary judgment, the court must accept the nonmoving party's evidence as true and construe all evidence in the nonmoving party's favor. *Eastman Kodak Co. v. Image Tech. Servs.*, 504 U.S. 451, 456 (1992). The movant can prevail only if the materials offered

in support of the motion show there is no genuine issue of material fact. *Celotex*, *supra*, 477 U.S. at 323.

## Discussion

### 1. Reverse Sex Discrimination

To survive a motion for summary judgment, Kohorst must adduce direct or circumstantial evidence of unlawful discrimination. *E.g.*, *Dicarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004). Because Kohorst has not offered direct evidence of discrimination, the *McDonnell Douglas* burden-shifting framework applies. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, the plaintiff must first make out a prima facie case of discrimination, after which the burden shifts to the employer to proffer a legitimate nondiscriminatory reason for its decision. *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1020-21 (6th Cir. 2000). If the employer carries the burden, the plaintiff must then prove that the employer's proffered nondiscriminatory reason was pretextual. *Id.*

To establish a prima facie case of discrimination, a plaintiff must show that he 1) is a member of a protected class; 2) was qualified for the job or promotion sought; 3) experienced an adverse employment action; and 4) was replaced by someone outside of the protected class or was treated differently than similarly situated employees outside the protected class. *Arendale v. City of Memphis*, 519 F.3d 587, 603 (6th Cir. 2008).

A reverse-discrimination case, however, "carries a different and more difficult prima facie burden." *Briggs v. Potter*, 463 F.3d 507, 517 (6th Cir. 2006). The plaintiff in a reverse-discrimination case must show that "background circumstances support the suspicion that the defendant is that unusual employer who discriminates against the majority . . . and upon a showing that the employer treated differently employees who were similarly situated but not

members of the protected group." *Id.* (citing *Yeager v. Gen. Motors Corp.*, 265 F.3d 389, 397 (6th Cir. 2001).

I will assume, without deciding, that Kohorst can establish a prima facie case of reverse gender discrimination. Because the hospital provides a legitimate, nondiscriminatory reason for Kohorst's termination — that his problems with multitasking and prioritizing, namely his failure to put patient care first, resulted in repeated delays in patient care and jeopardized patient safety — the burden shifts to Kohorst to demonstrate pretext. Kohorst cannot show pretext.

To establish pretext, a plaintiff must show that an employer's stated reason: 1) had no basis in fact; 2) did not actually motivate the challenged conduct; or 3) was insufficient to explain the challenged conduct. *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994).

Kohorst does not dispute that he allowed lengthy delays in patient care, nor does he dispute that management counseled him extensively that patient care should be his priority. Kohorst argues that his "legitimate" reasons for failing to provide prompt patient care in January and May of 2008 prove that the stated reasons for his termination are pretextual.

In the January 2008 incident, Kohorst claims that he could not perform the CT abdominal scan. The record shows that he had performed abdominal CT scans. Kohorst's motion in opposition discusses a CT angiography, which is a distinct examination from that ordered in this case. His attempts to discredit the testimony of the hospital's fact witnesses do not further his argument because "a plaintiff has the duty to make an affirmative showing and the mere hope of questioning the credibility of defendant's witnesses is not sufficient to resist summary judgment." *F & J Enerprises, Inc. v. Columbia Broadcasting Systems, Inc.*, 373 F. Supp. 292, 299 (N.D. Ohio 1974).

Regardless of whether Kohorst could perform the exam, he had a duty to make sure the patient received the exam. Kohorst did not make clear to Mueller that he was not going to perform the procedure. Kohorst himself wrote an account of the incident in which he stated, "I regret not being absolutely clear I needed Lisa to come in." [Doc. 26, at 19]. Where the employer demonstrates that it reasonably relied on particularized facts before it at the time it made the employment decision, plaintiff has not shown pretext. *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998). The hospital disciplined Kohorst for causing a delay in patient care that jeopardized patient safety, and Kohorst has not provided any evidence that this reason was mere pretext.

Regarding the May 5, 2008 incident, Kohorst claims the hospital presented him with a Morton's Fork.[2] Having been instructed to stay with the student, he believed he would be subject to discipline for leaving to perform his RT duties, and staying with the student subjected him to discipline for abandoning his RT duties. But the record demonstrates that Kohorst received counseling on several occasions that patient care always comes first. In the face of that overriding instruction, Kohorst's contention that he would be disciplined for leaving the student to perform his RT duties is speculative at best.

Kohorst cannot establish pretext, and therefore his reverse-discrimination claim fails as a matter of law.

---

[2] A Morton's Fork is a choice between two equally unpleasant alternatives. John Morton, Lord Chancellor of England in 1487, devised a tax policy which assumed that the rich could afford to contribute and the poor were concealing wealth. Thus, whether the subject was rich or poor, the tax collector could insist he had either income or savings enough to spare for taxes. These arguments were the two prongs of the fork and the origin of the expression.

### 2. Intentional Infliction of Emotional Distress

Kohorst must show four elements to establish a claim for intentional infliction of emotional distress:  1) the hospital intended to cause Kohorst emotional distress, or knew or should have known that its actions would cause serious emotional distress; 2) the hospital's conduct was extreme and outrageous; 3) the hospital's actions proximately caused Kohorst psychic injury; and 4) the mental anguish Kohorst suffered was serious. *Hanly v. Riverside Methodist Hosp.*, 78 Ohio App. 3d 73, 82 (1991).

Kohorst cannot satisfy any element of this claim. The only evidence Kohorst advances in support of this claim is the adverse employment decision. Under Ohio law, an unfair employment decision, without more, does not support a claim of intentional infliction of emotional distress. *Godfredson v. Hess & Clark, Inc.*, 173 F.3d 365, 376 (6th Cir. 1999). The hospital is entitled to summary judgment in its favor on the intentional infliction of emotional distress claim.

### 3. Public Policy

Four elements must be satisfied to establish a claim for wrongful discharge in violation of public policy:

> 1. That clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the clarity element).
>
> 2. That dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the jeopardy element).
>
> 3. The plaintiff's dismissal was motivated by conduct related to the public policy (the causation element).
>
> 4. The employer lacked overriding legitimate business justification for the dismissal (the overriding justification element).

11

*Avery v. Joint Twp. Dist. Mem'l Hosp.*, 286 Fed. Appx. 256, 260-261 (6th Cir. 2008) (unpublished disposition) (applying Ohio law).

Kohorst alleges that his refusal to perform the abdominal CT scan on January 31, 2007 accorded with public policy, and his subsequent termination was therefore a wrongful discharge. Kohorst cannot establish all of the elements of the claim based on this incident.

Kohorst asserts that Ohio Revised Code §§ 4773 and 3748, the license requirements for a RT, support his public policy claim. He does not show how the hospital violated either of those statutes. Kohorst admits that he passed his national board exam, that he obtained his radiology technologist license through the state of Ohio, and that he kept his license current during his employment at the hospital.

Kohorst also asserts that the ARRT ethical rules have the force and effect of a statute for the purposes of establishing a public policy violation because the Ohio Administrative Code refers to ARRT certification in radiography. Kohorst proposes that because ARRT certification is one way to obtain a state license, the fact that the certification may be revoked by violating the ARRT ethical rules gives the rules the same force and effect as a statute.

The hospital argues that nothing in the Ohio Administrative Code or Ohio Revised Code states that failure to follow the ARRT ethical rules will result in the revocation of a state license in radiography. ARRT certification is only one way to obtain a license in radiography; an applicant may pass a state administered examination and obtain a state license in radiography without being subject the ARRT policies. Ohio Admin. Code § 3701-72-02(B)(8). The hospital therefore asserts that Kohorst has not shown that the ARRT ethical rules are of "equally serious import as the

12

violation of a statute," as the Ohio Supreme Court requires to show a clear public policy. *Avery*, *supra*, 286 Fed. Appx. at 260-61 (citing *Painter v. Graley*, 70 Ohio St. 3d 377, 384).

The rule at issue states that "failure or inability to perform radiologic technology with reasonable skill and safety" is an ethics violations. ARRT Standards of Ethics (2009). I need not decide whether violation of this rule is of "equally serious import as the violation of a statute," because Kohorst cannot establish any other element of the wrongful discharge claim.

Kohorst cannot establish the jeopardy element of the claim because he did not put the hospital on notice that he was somehow invoking a government policy when he refused to perform the abdominal CT scan. Kohorst first informed management that he believed himself incompetent to perform the CT scan when he was disciplined for the incident. As the record shows, he did not make clear initially that he needed the more experienced RT to perform the exam.

Kohorst cannot establish the causal relation necessary for his claim. Kohorst was disciplined not for refusing to perform the exam, but for the delay in patient care. Kohorst received counseling again for a later incident involving delay in patient care. Kohorst's ultimate dismissal resulted from another serious failure to provide timely patient care on May 5, 2008. Kohorst cannot, therefore, show that his dismissal was motivated by conduct related to the public policy.

Finally, Kohorst cannot establish the overriding justification element. As discussed above, the evidence demonstrates that the hospital terminated Kohorst's employment because his poor judgment led to repeated long delays in patient care. This is a legitimate business reason for the hospital's decision, and Kohorst has presented nothing to rebut this reason or show it is pretextual.

Kohorst's wrongful discharge in violation of public policy claim fails as a matter of law.

**4. Negligent Supervision**

A plaintiff must show five elements to establish a claim for negligent hiring, supervision or retention: 1) the existence of an employment relationship; 2) the employee's incompetence; 3) the employer's actual or constructive knowledge of such incompetence; 4) the employee's act or omission causing the plaintiff's injuries; and 5) the employer's negligence in hiring, retaining or supervising the employee as the proximate cause of plaintiff's injuries. *Ruta v. Breckenridge-Remy Co.*, 69 Ohio St. 2d 66, 69 (1982). There is no dispute as to the existence of an employment relationship.

"Ohio Courts take the view that a plaintiff must be able to establish a tort claim against the individual employee in order to maintain an action for negligent supervision or retention against the employer." *Hout v. Mansfield*, 550 F. Supp. 2d 701, 746 (N.D. Ohio 2008) (citing *Myers v. Goodwill Indus. of Akron, Inc.*, 130 Ohio App.3d 722, 721 (1998) (negligent retention claim against employer failed where plaintiff could not show that the employee's conduct rose to the level of intentional infliction of emotional distress)).

Kohorst alleges discrimination only under Title VII, not Ohio law. Title VII does not provide for individual liability of supervisors. *Wathen v. GE*, 115 F.3d 400, 405 (6th Cir. 1997). Even if Kohorst had established Title VII liability, he could not satisfy the elements of negligent supervision. Moreover, because he cannot satisfy the elements of his intentional infliction of emotional distress claim, his negligent supervision claim cannot succeed on that basis. Kohorst has asserted no evidence of incompetence.

Even if Kohorst could establish a basis by which a supervisor could be liable in tort, his claim still fails because he cannot show the hospital knew or should have known about the alleged

tortious behavior of the supervisor. Kohorst admits he never reported misconduct to anyone in human resources or upper management, nor did he complain to anyone at the hospital about discrimination. Nothing in the record supports finding that the hospital's failure to supervise or its decision to hire or retain any of its supervisors proximately caused of Kohorst's injuries. Accordingly, his negligent supervision claim fails as a matter of law.

## Conclusion

For the foregoing reasons, it is hereby

ORDERED THAT defendant Van Wert County Hospital's motion for summary judgment [Doc. 23] be, and the same hereby is granted.

So ordered.

s/James G. Carr<br>
United States District Judge